1              UNITED STATES DISTRICT COURT

2           FOR THE WESTERN DISTRICT OF WISCONSIN

3     * * * * * * * * * * * * * * * * * * * * * * * * *

4     OCEAN SPRAY CRANBERRIES, INC.,

5          Plaintiff,

6       -vs-                           Case No. 10-MC-30-SLC

7     DECAS CRANBERRY PRODUCTS,        Madison, Wisconsin
      INC., et al.,                    January 5, 2011
8              Defendants.             1:02 p.m.

9     * * * * * * * * * * * * * * * * * * * * * * * * *

10  STENOGRAPHIC TRANSCRIPT OF AUDIO RECORDING OF TELEPHONIC
      HEARING HELD BEFORE MAGISTRATE STEPHEN L. CROCKER,

11

12  APPEARANCES:

13  For the Plaintiff:  Quarles & Brady
                        BY:  ATTORNEYS MATTHEW DUCHEMIN
14                      and MATTHEW SPLITEK
                        33 East Main Street, Ste. 900
15                      Madison, Wisconsin  53703

16                      Latham & Watkins
                        BY:  ATTORNEYS AL PFEIFFER
17                      and JENNIFER GIORDANO
                        505 Montgomery Street, Ste. 2000
18                      San Francisco, California  94111

19  For Defendants Bentz, Gitter & Teske:  Bosshard Parke
                        BY:  ATTORNEY ANDREW BOSSHARD
20                      505 King Street, S-334
                        LaCrosse, Wisconsin  54601
21  For Defendant Decas:  Miller, Canfield, Paddock & Stone
                        BY:  ATTORNEYS GREGORY CURTNER
22                      and KIMBERLY SCOTT
                        101 North Main Street
23                      Ann Arbor, Michigan  48104

24            Lynette Swenson, RMR, CRR, CBC
                   Federal Court Reporter
25    U.S. District Court   120 N. Henry St., Rm. 520
             Madison, WI  53703   (608) 255-3821

1    THE COURT:  Good afternoon.  This is Magistrate

2 Judge Crocker.  I understand I have the attorneys for

3 the various parties and third-party witnesses in the

4 *Ocean Spray* case against *Decas Cranberries and others*.

5 I have the recorder on.  We don't have a court reporter

6 available now.  So let me just indicate for the record

7 that our case number is 10-MC-30.  As you know, your

8 number in Massachusetts is 10-CV-11288.

9    And let's get some appearances, please.  First, who

10 have we got on behalf of plaintiff Ocean Spray?

11    MR. DUCHEMIN:  Good afternoon, Your Honor.

12 This is Matt Duchemin and Matt Splitek from Quarles and

13 Brady on behalf of plaintiffs.  And I'd like to

14 introduce the Court to the lawyers for the Massachusetts

15 action from Latham and Watkins, who are also on the

16 phone, Al Pfeiffer and Jennifer Giordano.  I understand

17 that Mr. Pfeiffer will be taking the lead arguing today.

18 They have been admitted to the Western District of

19 Wisconsin, I understand effective January 3rd, and

20 although they haven't made an appearance yet in this

21 case formally, they're prepared to do so if the Court

22 deems that necessary.

23    THE COURT:  No, that's fine.  We tend to take a

24 fairly informal approach to this.  I granted that

25 pro hac vice motion yesterday.  So good morning to all

1    of you.

2         All right.  Then who have we got on behalf of the

3    named defendants today, if anyone?

4              MR. BOSSHARD:  Your Honor, Andrew Bosshard from

5    Bosshard Parke in La Crosse.  And I have co-counsel from

6    Ann Harbor, Michigan, Gregory Curtner and Kim Scott from

7    the Miller Canfield law firm.

8              THE COURT:  All right.  Well, good afternoon to

9    all of you.

10             MR. PFEIFFER:  Your Honor, if I may.  This is

11   Al Pfeiffer.  Just to clarify.  We contacted counsel for

12   the Decas defendants, the named defendant in the

13   Massachusetts action, and they elected not to appear

14   this afternoon.

15             THE COURT:  Okay.  Fair enough.  And that's

16   actually where I was headed with this.  So Mr. Bosshard,

17   you've got the deponents:  Mr. Bentz, Mr. Gitter and

18   Mr. Teske?

19             MR. BOSSHARD:  That's correct, Your Honor.  I'm

20   also going to defer to out-of-state counsel in arguing

21   today, Mr. Curtner and Ms. Scott, if that's okay with

22   the Court.

23             THE COURT:  That's absolutely fine.  Let's just

24   set the stage a bit.  We've got an hour if we need it,

25   but I'd like to keep it shorter, and frankly, I don't

1  think we need that much time.

2      I've got three motions to compel docketed as 1, 4

3  and 7 against Mr. Bentz, Mr. Teske, and Mr. Gitter

4  respectively.  The response was a motion to quash

5  docketed by us as 11.  Although Ocean Spray then said

6  well hey, let's get a seven-day response to that in and

7  then move the hearing back, the court said no, which

8  prompted plaintiff to get in its written response, I

9  believe, yesterday afternoon.  And I did read that.

10 That's been docketed as 30.  I've read all the

11 attachments.

12     So you've inserted this Court into the cranberry

13 wars, so I guess we just have to sort out what needs to

14 happen here today.  And I'll hear from each side in

15 turn.  We'll start with plaintiff as the original movant

16 and then get some input from the group that I'm calling

17 *the deponents*, through Mr. Curtner and Ms. Scott, I

18 suppose, and then if necessary, we'll ping-pong it a

19 bit.  At least as local counsel know, I tend to be

20 fairly conversational and proactive during these

21 telephone calls to make sure that I understand what's

22 going on and get the facts that I need.  So please

23 pardon any interruptions that I make, because there

24 definitely will be some.

25     But before I get input, why don't I give you the

1  Court's sense as to where I think we are headed today so
2  that nobody has to shoot in the dark.  I have a general
3  sense as to where the lines are drawn here, and the
4  antagonism between the various parties is palpable.
5  Fair enough.  That's really not this Court's concern.
6  It's up to Massachusetts to sort out the merits of the
7  underlying lawsuit under the AFPA and the allegations
8  there.  To the extent that that might have some bearing
9  on this Court's Rule 45 analysis, certainly we can go
10 there if we need to.
11     But my initial concern is a little bit more
12 pragmatic.  And I don't know what to draw from the fact
13 that the Decas defendants chose not to participate
14 today.  But the most practical concern I've got today is
15 one raised by the deponents in that they don't want to
16 have to sit through more than one deposition in this
17 case.  And that resonates with the Court.  I understand
18 or at least I can infer with some accuracy that this
19 initial deposition is intended to sort out the sheep and
20 the goats here and maybe put some of the deponents into
21 the goat category as defendants.  I think everyone is
22 sort of predicting that that's where this is all headed.
23 And I understand that the court in Massachusetts has
24 pretty much directed the plaintiff, Ocean Spray, to get
25 those John Does identified sooner rather than later,

1 which prompted this early discovery.  I understand all
2 that and I don't have a problem with any of that.
3     However, if we've got new defendants who have been
4 named and apparently who have been served, and I'm
5 thinking specifically of Swendrowski and Bogs right now.
6 I don't know what their position is on these
7 depositions.  And frankly, I don't know what Decas's
8 position is, and they're not on line to tell me today,
9 so I won't draw any conclusions, although I might infer
10 that they may not care a lot.  Certainly that's fair
11 game for either side to discuss when I give you a chance
12 today.  But it seems to me that the best way to assure
13 that we don't have to subject Misters Bentz, Gitter or
14 Teske to more than one deposition, in the event they are
15 not parties, is to allow Swendrowski and Bogs to appear
16 and respond in some fashion, whether it's a motion to
17 dismiss or something else, and find out whether they
18 want to be part of this at the front end.
19     I also have some secondary questions about the
20 efficacy of the depositions that have been proposed as
21 to why now.  Why not wait until you get the discovery
22 responses from the named defendants?  It's my
23 understanding that the responses were due December 22.
24 I don't know if that's actually occurred.  That was
25 right before Christmas.  So I'd like some information

1  about that.  Have you got the information?  Have they

2  named names?  Have they pretty much said who's talking

3  about antitrust and so forth?  And does that give you

4  the information you need as a plaintiff to start

5  identifying the John Does?

6      Then we have some other concerns about the scope of

7  the documents requested.  At least from the Court's

8  perspective, it's asking for some stuff that probably

9  isn't fair game.  But I'm not going to quash the

10 deposition for anybody just because they're claiming

11 some attorney/client privilege.  As I think Ocean Spray

12 correctly noted, in the Seventh Circuit at least you

13 can't just stand up discovery or a deposition, you have

14 to make your attorney/client privilege or work product

15 privilege assertion question-by-question and

16 category-by-category and document-by-document.  Even so,

17 I think that we do have some concerns about some of the

18 document requests here, but I don't think that's a

19 primary concern.  It may not even be secondary.  My main

20 concern right now is timing and undue burden.  My

21 secondary concern is limiting the scope of this, and

22 then I guess that would be it for now.

23      So that's the Court's preliminary view.  And I

24 guess sort of the upshot of all that is I'm not inclined

25 to quash the subpoenas completely.  I think they're fair

1  on at least one or two levels.  I just think that it

2  might be premature to proceed under Rule 45 if there's a

3  possibility that this may be just round one of several.

4      So with that, I'm done talking preliminarily.

5  Let's get some input on behalf of Ocean Spray as the

6  movant, please.

7          MR. PFEIFFER:  Thank you, Your Honor.  I'll try

8  to keep this as short as possible and try to focus on

9  the issues you've just raised.  I think that really gets

10  to the heart of it, Your Honor.  The reason we're here,

11  the reason we served these subpoenas is because we do

12  have this case in Massachusetts where we understand that

13  there have been a number of parties involved in these

14  violations of the Agricultural Fair Practices Act, but

15  we don't know who they are.  We've only been able to

16  identify a very few of them, and that's not

17  surprisingly, I guess, because we're not a party to the

18  communications that they're having.  I think by and

19  large, at least as far as we understand, the Ocean Spray

20  growers are not a main target of that and non-Ocean

21  Spray growers seem to be where the main part of the

22  action is going, which is why we have targeted these

23  individuals for the discovery.  I think at this point we

24  really are just -- we are trying to get information.  At

25  this point, we have no idea whether these three

1    individuals are people who are likely to be added as

2    defendants or not.  I did want to correct that, Your

3    Honor.  If there has been some suggestion that we

4    believe that's the case, we really don't know.

5            THE COURT:  Mr. Pfeiffer, this is my first

6    interruption, I apologize, but there will be others.

7    I'm just curious, perhaps idly so.  Are you doing this

8    with other third-party witnesses in other districts or

9    are these three it right now?

10           MR. PFEIFFER:  We've started here.  I think the

11   answer is, Your Honor, we don't expect that this will be

12   it because the cranberries are grown predominantly in a

13   few states, but Wisconsin is the biggest cranberry

14   producing state and it's where most of the growers are

15   involved.  And we understand that there -- we understand

16   there have definitely been communications, meetings, et

17   cetera, in Wisconsin, and so we started there.  We

18   suspect that there may also be some others; that we may

19   end up in other districts as well.  But at this point,

20   we started in Wisconsin because we understand that

21   that's the definite focus point of this activity.

22           THE COURT:  Okay.  Back to you.  I have some

23   other questions, but I'll wait because you may address

24   them with your responses.

25           MR. PFEIFFER:  Certainly, Your Honor.  That's

1    why we're here.  It also -- it ties to what we found out

2    when we talked to these folks.  Because there's no

3    dispute here that we properly served each of these three

4    individuals and they responded to us with letters back

5    saying no thanks, we're not going to appear.  At that

6    point, we contacted them, and obviously the first thing

7    we did was ask whether they were represented by counsel,

8    and each of them told us they were not.  And so we

9    talked to them.  We explained we need to take these

10   depositions.  The Court, in fact, has told us to take

11   discovery to identify those.  And then each of them, in

12   the process of our communications with them, confirmed

13   that they have some relevant information; they knew

14   about communications, some in writing, some not in

15   writing, that relate to our existing Massachusetts AFPA

16   case.  And in fact, they don't deny that in their motion

17   to quash either, that they actually do possess some

18   relevant information.  We said well look, we'll work

19   with you on dates.  We'll work with you on locations if

20   that's the problem, let us know, and we could work

21   around that and get this done smoothly.  But otherwise

22   if you don't, we're going to need to move to compel

23   because we actually have to get this done, and this is a

24   good starting point for it.  That's what really prompted

25   this motion, because they then again responded in

1  writing and just said no, and have taken a position, I

2  think amplified in their motion to quash, that we're

3  really not entitled to any discovery at all from anyone

4  based on a view of the merits of our case.

5       So with that, that's kind of gotten us to this

6  point right now where we need to move forward with

7  discovery.  I'm sensitive to the Court's concern and to

8  these growers' concern about the possibility that the

9  addition of more defendants might subject them to

10 additional deposition obligations.

11      With the Swendrowski and Legacy Bogs defendants in

12 particular, I can tell you on behalf of Ocean Spray we

13 certainly have no objection to giving the Swendrowski

14 defendants notice of these depositions and an

15 opportunity to participate in them, even without waiving

16 any jurisdictional arguments that they might raise, if

17 they're planning to raise any.  I don't know if they

18 are.  I think that aspect of it is relatively easily

19 dealt with.  The notion that there could be other

20 defendants who might say I want to go and take

21 Mr. Benson's deposition, for example, that's more

22 difficult to deal with, but I think is always the case

23 when there are Doe defendants and in this case where we

24 don't have access to the identity of the Does without

25 going and doing discovery, I don't think that there is a

1   perfect solution to that, one that can absolutely

2   insulate them.

3           THE COURT:  Sure.

4           MR. PFEIFFER:  Swendrowski and Legacy Bogs

5   defendants, I think we can make that easy by certainly

6   offering them the opportunity to participate in the

7   depositions.

8           THE COURT:  Mr. Pfeiffer, let me interrupt.

9   It's not clear to me, and maybe I just missed it, but

10  were the Decas defendants interested at all in

11  participating in these depositions when you noticed

12  them?

13          MR. PFEIFFER:  Yes, Your Honor.  I believe they

14  were intending to attend the depositions.

15          THE COURT:  Okay.  Thank you.

16          MR. PFEIFFER:  We -- I think both of us were.

17  Both they and we were about to get on airplanes to come

18  and take them when we got those letters saying they

19  weren't going to appear.  So I believe they were going

20  to participate; they just chose not to participate in

21  this hearing.  We invited them and they said --

22          THE COURT:  Understood.  Let me interrupt with

23  another question, and then hold your thought and

24  continue with your presentation.  But I understand from

25  the very fact that you filed these motions and all of

1  your documents in support that you're being pushed by

2  the court in Massachusetts to get your Does identified.

3  But it's not at all clear to the Court what kind of time

4  line you can expect in a civil lawsuit in Massachusetts.

5      I think we're fairly predictable.  I know

6  Mr. Duchemin could tell you that.  But we set quick firm

7  trial dates, usually a year or less from the pretrial

8  conference.  What's going to be happening here?  In

9  other words, if it takes you two, three, even four

10  months to identify all of your Does, what impact will

11  that have on how quickly you will move forward, if any?

12      MR. PFEIFFER:  Well, I think that's exactly the

13  problem, Your Honor.  Where things stand with the

14  Massachusetts court is the court didn't want to set a

15  full schedule for the case.  It hasn't set a trial date

16  at this point, precisely because she wants to get a

17  better sense of exactly who all is going to be in the

18  case.  And so it does -- the more this process drags

19  out, unfortunately the more it does drag out the overall

20  staging of the Massachusetts case, which is one of the

21  reasons we're trying to jump on this as expeditiously as

22  we can.

23      THE COURT:  Okay.

24      MR. PFEIFFER:  Another point on the Decas

25  defendants, Your Honor, not only obviously did they not

1   appear at this telephone hearing, but even though they

2   were going to participate in the depositions and are

3   interested in that process, they never moved to quash

4   these subpoenas.

5        THE COURT:  Well, they don't have standing, so

6   that's not unusual.

7        MR. PFEIFFER:  Okay.  I'll go no further with

8   that one.  I think I may have interrupted you as you

9   were about to ask another question.

10       THE COURT:  Right.  Well no, I do that a lot,

11  but that's just the way I hold these conferences.  The

12  next question I wanted to ask you was understanding that

13  you're sort of in limbo in Massachusetts because the

14  judge is waiting for the Does to get identified, we've

15  got this assertion on behalf of our three deponents here

16  that your lawsuit is worthless.  It's a strike suit.

17  Understanding that your position on that is diametric,

18  what response has Decas filed?  Are there motions to

19  dismiss filed instead of answers or is there a motions

20  deadline for preliminary 12(b)(6) motions from the

21  court?  How is that going to be addressed promptly, if

22  you know.

23       MR. PFEIFFER:  Well, the Decas defendants, the

24  existing served defendants actually, Your Honor, chose

25  not to file motions to dismiss.  They have answered.

1          THE COURT:  Okay.  Thank you.  I'm done with

2    questions for now, so why don't you continue.

3          MR. PFEIFFER:  Okay.  But that point I think

4    that does speak to the merits issue; that the defendants

5    that are actually in the case, the real world ones,

6    looked at this, has determined, obviously we'd be

7    reading their minds, but they decided to answer, not

8    move to dismiss.  And I don't think they, you know,

9    intended to confess liability by doing so, but we've got

10   right now, we've got a case that is on the merits not

11   challenged and there was an opportunity obviously -- and

12   we all know litigators.  We challenge things if we think

13   there's a good solid basis to do that.  They didn't do

14   that.  They went ahead and answered and the case has

15   gone forward and the court has looked at it and the

16   court, in the parties' preliminary status conference --

17   I would call it a scheduling conference, but she didn't

18   actually set a schedule -- she talked to the parties

19   about the merits and I think she's intrigued by the

20   case, certainly did not suggest to anybody we should be

21   briefing a motion to dismiss that wasn't made.

22        So Your Honor, I think where that brings us back to

23   is this is a case where the subpoenas were validly

24   issued, properly served, they're addressing discovery,

25   knowledge information that these parties have that is

1   within the scope of our validly pleaded allegations in

2   that case.  Nobody is suggesting again that what we're

3   asking for is not relevant to the case.  What they're

4   saying is there's no case and that, I think -- the

5   question of the merits really does belong in front of

6   the Massachusetts court.

7        To the extent that in the Rule 45 setting courts

8   look at the merits, typically that's in the setting of

9   is this discovery related to the merits.  But that's not

10  an argument that's being made to you here.  So I think

11  this really is a pretty clear-cut situation where, you

12  know, if there's some suggestion that particular items

13  we've asked for are too broad or something, that's

14  actually never been asserted.  There's never been any

15  particularized objection here as to Request Number 3 is

16  too broad or something like that.

17       To the extent that the scope objection is addressed

18  to the attorney/client privilege, that really is dealt

19  with by making a privilege objection and withholding

20  discovery, not by saying well, therefore this motion --

21  this Rule 45 subpoena can't go forward.  I think that's

22  the easy solution to that situation as well.  If they

23  want to assert the attorney/client privilege, the

24  growers have the ability to do that, but that's not

25  grounds to quash a validly issued subpoena.  So I think

1  where we are is these subpoenas should be enforced.

2          THE COURT:  Okay.  Two more unrelated questions

3  to you, Mr. Pfeiffer, then I'll hear, I believe, from

4  Mr. Curtner on behalf of the deponents.  The first

5  question is when you filed your Complaint and named the

6  Does, you've already told me that you don't really have

7  access to who these people are, which is why you

8  identified them as Does, but you can pretty much surmise

9  that Wisconsin and Oregon are where they may be.  Well,

10  we all know what Rule 11 requires, so I don't mean to

11  imply that you don't know what you're talking about.

12  But for the purposes of talking to these three

13  deponents:  Mr. Bentz, Mr. Gitter and Mr. Teske, what

14  basis do you have to seek them out as your information

15  sources as the point people, as the first ones to go

16  after?

17          MR. PFEIFFER:  We identified these three as

18  people -- well, I guess I'll take them one-by-one.

19  Mr. Gitter is actually involved in a separate

20  cooperative, as we understand; that he has been involved

21  in some communications.  And part of this is sort of the

22  telephone game.  We hear things from someone, who heard

23  things from someone else, and that's kind of the

24  problem.  But it's the nature, I think, of the

25  agriculture community is there's a lot of word of mouth.

1   And I guess that's really the short answer is we've

2   identified these three individuals through word of mouth

3   as people who would have knowledge of these

4   communications.   No one said that they're the ring

5   leaders of them or that they're likely defendants, but

6   that they had knowledge of written and oral

7   communications relating to these AFPA claims.   We know

8   that there have been meetings in person.   We understand

9   that there have been meetings at which a large number of

10  growers have been present, for example.   We just don't

11  know who they are.   But through the word of mouth in the

12  agriculture community, people who weren't there are

13  hearing about these things and they identify these three

14  as likely candidates who would have been at least at

15  some of the meetings and would know about written and

16  oral communications that were circulated.

17          THE COURT:   Thank you.   So here is my last

18  question before I get some input on behalf of the

19  deponents, but in a way it segues tangentially from my

20  Rule 11 citation in my previous question.   But you've

21  got a very broad list of document requests attached to

22  the subpoenas, and I've got a hard copy in front of me.

23  I printed that out.   And I circled some about which I

24  had questions, and these are not rhetorical questions, I

25  don't ask rhetorical questions, but I'm looking

1   specifically at 5, 13 and 14.  And just to refresh your

2   recollection, I'm sure you don't have that in front of

3   you, but 5 is documents relating to meetings you

4   attended in which people discussed possible lawsuit.  13

5   is more general:  Documents, commercial advertising,

6   public statements, et cetera relating to Ocean Spray.

7   Not claiming falsehood, but just anything related to

8   Ocean Spray.  And 14 is all documents received from

9   anyone contemplating a lawsuit.  Well, as you know,

10  under 2303, what you have to prove is that somebody

11  knowingly made false reports, among other things.  Why

12  is it discoverable to learn that people are thinking

13  about a lawsuit when people thinking about a lawsuit

14  have their own Rule 11 obligations not to make false

15  statements to the court?  In other words, why should

16  these three topics be allowable at this point as

17  discoverable information given the nature of scienter

18  required in your lawsuit?

19         MR. PFEIFFER:  Certainly, Your Honor.  We have

20  received some written communications that have been

21  exchanged among growers and accusations have been made

22  in those written communications that accuse Ocean Spray

23  of having committed knowing violations of the antitrust

24  laws, including having manipulated auction processes,

25  which essentially amounts to an accusation of us having

1  engaged in criminal price-fixing behavior, and also

2  allegations that we are responsible for basically the

3  ruination of the cranberry industry through our

4  practices.  We know that those kind of written documents

5  are out there, and in those written documents those are

6  stating that that is -- that that is the supposed basis

7  for this threatened lawsuit.  So the fact that a lawsuit

8  is based upon activity or based on accusations, let's

9  immunize those accusations, and that's why we focused on

10 these suits, because we think that that will be again,

11 under the standard of reasonably likely to lead to the

12 discovery of admissible evidence, we think those

13 meetings where they were discussing lawsuits, would be

14 the same meetings where they would be discussing those

15 kind of factual allegations, which are simply false.

16         THE COURT:  Well, that leads to one question

17 which I suppose you and I might deem impertinent, but

18 I'm going to ask it anyway.  Page two of the brief in

19 support of the motion to quash starts the background

20 section by asserting Ocean Spray is a monopolist in all

21 aspects of the growing, processing, manufacturing of

22 cranberries and cranberry-related products.  Is that a

23 2303 violation right there?

24         MR. PFEIFFER:  I don't think that doing it in

25 an actual pleading is a violation, but I honestly don't

1   know the answer to that, Your Honor.  I would suspect

2   not, but I don't know the answer.

3          THE COURT:  Okay.

4          MR. PFEIFFER:  To the extent that it

5   constituted a sham allegation, then I think it probably

6   would be.  My understanding -- I would draw more on the

7   analogy of *Noerr-Pennington* liability or immunity under

8   the antitrust laws and the typical rule obviously being

9   that if you state something in a court filing, that's

10  not actionable, but it can be in a setting where the

11  litigation is itself completely without merit and

12  therefore a sham.

13         THE COURT:  Understood.  Well, I think this

14  sort of veers into the merits, which is not at all the

15  issue before this Court and I don't intend to go there,

16  but clearly the deponents and their lawyers and perhaps

17  a lot of their colleagues and friends truly believe that

18  Ocean Spray is a monopolist or they wouldn't have

19  asserted it so vigorously.  So then you have to wonder

20  if they really believe this, did they knowingly make

21  false reports.  But that is a rhetorical question.  I

22  don't expect an answer.

23         But Mr. Curtner, I think that's your cue.  Why

24  don't you give me your input, if you're the spokesperson

25  today, about where we landed and what ought to happen

1    next.

2          MR. CURTNER:  Thank you, Your Honor.  First of

3    all a point of clarification.  Mr. Swendrowski and

4    Legacy Bogs have not been served or at least as of two

5    days ago had not been served and the court in

6    Massachusetts allowed the First Amended Complaint on

7    December 9th.  The First Amended Complaint was actually

8    filed on December 14, but there's been no effort to

9    serve Swendrowski or Legacy, even though they live and

10   have a place of business, they're easy to find in

11   Wisconsin, and so what's going on here is a bit of cat

12   and mouse game.  They're trying to put pressure on these

13   three individual nonparties to be deposed and produce

14   information.  Hopefully -- apparently they hope they

15   would do so without the help of counsel.  Before

16   Mr. Swendrowski has a chance to respond and possibly

17   file a motion to dismiss, it's my understanding that he

18   intends to do so, if and when he is ever served.

19      The Decas defendants had a different issue before

20   them.  The allegations against Decas include not just

21   the claim that he participated in discussions about a

22   potential antitrust suit and that he may have urged

23   people to join in such an antitrust suit on behalf of

24   cranberry growers and handlers, but there's also an

25   allegation that he helped to sponsor a website about an

1  Ocean Spray product which he called *scam berries* or that

2  somebody called scam berries, and so there's a claim of

3  some kind of claim liable or false statements relating

4  to these things that were called *scam berries* and to a

5  website that supposedly was sponsored or not sponsored.

6  I think that's why they may have decided to answer

7  rather than move to dismiss.

8      But the only allegation against Mr. Swendrowski and

9  Legacy Bogs is that they somehow violated the AFPA by

10 sending a letter, and everybody has a copy of the

11 letter, there's no secret about that, in which

12 Swendrowski stated his views relating to the merits of

13 this lawsuit.  And you are correct that Ocean Spray is

14 widely viewed as a monopolist, including by the

15 Department of Justice back in the Eisenhower

16 Administration, and they are still subject to a consent

17 decree regulating their behavior under the antitrust

18 laws.  And I can send you tomorrow or this afternoon a

19 copy of a document issued by Ocean Spray and a press

20 release quoting Ocean Spray in which they bragged about

21 having 62% of the world's cranberry market under their

22 control.

23      THE COURT:  Well Mr. Curtner, let me interrupt

24 you there because I didn't mean to encourage merits

25 argument today because it really isn't any of my concern

1   and frankly I don't have jurisdiction over it in any

2   event.  But what I'd like to focus on is understanding

3   all of your arguments, and I think you made seven

4   different points in your motion to quash, and

5   understanding that at least among other things your

6   clients, the deponents, are asserting First Amendment

7   rights to free speech and assembly and so forth,

8   obviously that's their view.  And obviously from your

9   brief there is this view that apparently is truly held

10  that Ocean Spray is an monopolist and that nothing

11  they've said is false.

12      But notwithstanding that, for Rule 45 purposes, why

13  should Mr. Bentz, Mr. Gitter, and Mr. Teske not be

14  required to sit down and talk about these things if they

15  may be John Does or if they may have information

16  relevant to the John Does who are actually named in the

17  Complaint that's been filed?

18          MR. CURTNER:  I think two reasons, Your Honor.

19  And I was trying to get there.  I might have gotten a

20  little carried away on the merits of the antitrust

21  issues, but I could have gone on a long time.  The two

22  basic reasons are that on the scope, on the face of

23  these subpoenas, the information sought is all

24  protected.  It's either First Amendment protected speech

25  or assembly or seeking advice of counsel; or it's

1  material prepared by counsel or given to counsel for the

2  purposes of seeking legal advice; or it's joint interest

3  privilege by people with common interest seeking to

4  consider if, when, and how to pursue their legal rights.

5          THE COURT:  Well Mr. Curtner, I'm sorry, I'm

6  going to interrupt you just like I did with

7  Mr. Pfeiffer.  But I understand the attorney/client

8  privilege, and to the extent that these depositions ever

9  are held and I'm predicting they will be eventually,

10  certainly each one of your clients is entitled to make a

11  good faith assertion of attorney/client privilege or

12  work product privilege or whatever.  I mean that's all

13  clear from the rules and certainly nothing this Court

14  would ever require of them would change that.

15      But when you talk about First Amendment privilege,

16  I don't know what that means.  I mean let's start with

17  the baseline that the First Amendment means that all

18  speech is protected.  That doesn't mean you can't be

19  deposed about something you said.  You did invoke this

20  Court's ruling in the *Amazon* subpoena case, but that was

21  a little different.  That was a grand jury subpoenaing

22  third-party information in a criminal investigation, to

23  which they had absolutely no connection, and it was

24  looking into reading habits of private citizens.  Here

25  my understanding is that they're looking for -- the

1  plaintiff is looking for information about what was said

2  publicly that the plaintiff alleges was knowingly false

3  and which of course the speakers would disagree.  But

4  that's really not the point for today.

5      What First Amendment privilege exists here that

6  would prevent the deposition from occurring?

7          MR. CURTNER:  Your Honor, the statements and

8  the requests seek information that was not made

9  publicly.  It seeks information about meetings that were

10 attended by growers and lawyers to discuss possible

11 lawsuits.

12         THE COURT:  Okay.  But that's attorney/client

13 privilege, isn't it?

14         MR. CURTNER:  Yes, and it's also common

15 interest privilege.  But it's also -- it's clear that

16 the First Amendment -- and we cite the cases on that

17 point -- protects that just as the attorney/client

18 privilege does.  And so the freedom to associate, to

19 consider protecting your legal interests, is protected

20 by the First Amendment.  And on the face of these

21 subpoenas, that's all that's being sought.

22     Now I agree that ordinarily if relevant information

23 is being sought, that the way that you go is

24 question-by-question, document-by-document when there

25 are privilege issues involved.  But I think that this

1  case is actually fairly close to the *Amazon* grand jury

2  case where innocent third parties are being asked to

3  disclose information which is protected by the First

4  Amendment, just as the reading habits of the customers

5  of Amazon were protected by Your Honor under First

6  Amendment concerns.

7          THE COURT:  And I'm sorry for interrupting --

8  I'm sorry, but let me just ask for a little bit more

9  factual clarification because I'm sorry that this is

10 shooting past me, but I'm not grabbing it.  I understand

11 that if there were group meetings with attorneys present

12 and the discussion was, you know, should we sue Ocean

13 Spray or not and there was a lot of discussion there and

14 a lot of things said, that that's arguably and perhaps

15 actually privileged.  I don't have a concern about that.

16 But where I'm missing your argument is other than that,

17 the fact that these meetings were not open to the public

18 and perhaps held in somebody's basement den without an

19 attorney present or where they weren't seeking legal

20 advice but were simply railing against that horrible

21 monopolist Ocean Spray, certainly they're entitled to

22 their opinion, and certainly if it's true it's a

23 defense, but I don't understand why that's not

24 discoverable by Ocean Spray to attempt to figure out who

25 was saying these things that it alleges are knowingly

1  false.

2        MR. CURTNER:  There may be a hypothetical

3  possibility of some unprotected conversations.   I

4  understand the Court's concern and the Court's question.

5  But on the face of these subpoenas and on the face of

6  these motions, all that's being sought is either

7  protected information or the identity of possible

8  additional Doe defendants, which is outside the scope of

9  the current pleadings.  And the --

10        THE COURT:  Well, wait, wait, wait.  Let's back

11  up.  If the Does are named, they're in it.  It's just --

12  it's just that nobody knows what their actual identity

13  is.  So they're in the lawsuit.  It's just that neither

14  the plaintiff nor the Court nor perhaps even the Does

15  themselves know who they are.  So aren't they in the

16  lawsuit?

17        MR. CURTNER:  Except there's no allegation that

18  any of these Does did anything.  The only allegation is

19  that Decas did some things and that Swendrowski sent a

20  letter.  That's all we've got.

21        THE COURT:  Okay.

22        MR. CURTNER:  Those are the only factual

23  allegations in the Massachusetts case.  And what they

24  want to do is go out and find some other people who may

25  have been considering a lawsuit and may have, during the

1  course of that consideration, said something that
2  somebody might want to claim is false.  Expressing an
3  opinion about the merits of a monopoly claim is
4  certainly not something capable of being true or false.
5  But on -- so they properly responded by saying you are
6  seeking protected information.  I want -- I assert my
7  First Amendment rights, my attorney/client privilege
8  rights, my work product rights, and my preassociation
9  rights and my common interest rights.  The burden at
10 that point shifted to counsel for Ocean Spray under Rule
11 45(c)(1) to avoid undue burden or expense to protect a
12 person subject to a subpoena, and they didn't do that.
13 What they did is they called these individuals and said
14 show up or we're going to move to compel and for
15 contempt.  The three individuals then responded by
16 sending a second letter saying you are seeking
17 information that is protected under a variety of
18 doctrines.  We think that's inappropriate.  Ocean Spray
19 did nothing to comply with their 45(c)(1) burden and
20 they should be quashed on that ground alone.  We have no
21 basis on this record to think that the hypothetical
22 which you raise, which I agree is a legitimate concern,
23 has any basis in fact here; that these folks did
24 anything that is discoverable or that has anything to do
25 with any false statements that may or may not be

1  actionable.  And the burden is on the party seeking to

2  compel to protect these people from burden.

3       That goes back to the question if the issue is who

4  made a false statement to whom, Decas knows the answer

5  to that.  Swendrowski knows the answer to that.  To the

6  extent it's unprivileged, presumably it's discoverable

7  from them.  If the question is were some Ocean Spray

8  cooperative members somehow induced or coerced or

9  importuned to leave the co-op, the Ocean Spray members

10 who are part of Ocean Spray know the answer to that.

11 They can collect that information.

12      The judge in Boston expressed a grave doubt about

13 the merits of this case and told Ocean Spray to report

14 back by January 27th, at the next status conference, to

15 identify for her any members who have left the co-op

16 allegedly as a result of these false statements or any

17 persons who have declined to join the co-op as a result

18 of these alleged false statements.  At the last

19 conference, Ocean Spray was unable to identify any such

20 person, and in fact, we believe there is no such person

21 because the membership of the co-op has grown

22 substantially over the last year.

23          THE COURT:  Well Mr. Curtner, let me ask you

24 this because now we're veering back into merits and that

25 really isn't this Court's concern.  But it does raise a

1   question that I'd like to pose to you, and then I'll get

2   Mr. Pfeiffer's response as well.  But backing up to a

3   more general practice of most judges confronted with

4   Rule 45 subpoenas, certainly we all do what we think is

5   best when confronted with a motion to quash or to compel

6   in response to these types of cases.  But let's face it,

7   as I've said several times and as you all have

8   acknowledged, this case belongs to your judge in

9   Massachusetts.  Oftentimes the fairest and most

10  efficient way to resolve a lingering dispute is to get

11  input from the presiding judge, which of course is not

12  binding on the Rule 45 judge, otherwise we wouldn't even

13  be holding this hearing, but certainly can be of great

14  merit.

15        Now let me pose this question to you to get your

16  response to it:  In the event the Court were not to

17  quash the subpoenas today, and frankly I'm not going to,

18  I can't anticipate actually throwing them out today, but

19  were to stay their effect until a couple of things

20  happen:  One, that we get some sort of an appearance

21  response by Swendrowski and Legacy Bogs, and two, if the

22  parties think it would be efficacious to get input from

23  your presiding judge in Massachusetts as to whether this

24  is what she had in mind for identifying the people.

25  Frankly I think I would predict the answer to be it's

1  fair for Ocean Spray.  But in the event that the judge

2  is being proactive and is trying to move this along,

3  could it hurt anything to get her input, saying that she

4  has no problem with this and if it were her call to

5  make, she would allow some or all of the depositions to

6  go forward?  Or vice versa, that she thinks it's a waste

7  of time, the case is no good, and nobody should be

8  bothered with it.

9           MR. CURTNER:  Well, Your Honor, I certainly

10 think that Mr. Swendrowski and Legacy Bogs need to get

11 served and appear in the Boston action and do whatever

12 they're going to do in response.  And they may decide to

13 seek some relief about discovery from that judge.  It

14 may be that that judge will be asked directly by one or

15 more of the parties to get involved on some of these

16 issues because some of the discovery sought there will

17 go to the same privilege and work product issues and

18 First Amendment issues that we're raising here.  So I

19 think you are correct to say that that judge probably

20 ought to have first say on these things.

21      As to your specific request of whether it would be

22 okay to talk to that judge, I have no problem with that,

23 although I do think it would be better to wait until

24 after Swendrowski has done whatever he's going to do so

25 that all the -- at least the existing parties are before

1  that court.  Because it's my understanding that --

2          THE COURT:  Right, let me interrupt again.  I

3  apologize.  But certainly that was what I anticipated.

4  I don't mean to make this a hopscotching procedure or

5  leap-frogging procedure.  I was anticipating getting

6  Swendrowski and Legacy Bogs on board, getting them in

7  front of the Massachusetts judge, putting them -- figure

8  out what their position is on these Rule 45 subpoenas,

9  and then perhaps putting it before that judge.  Because

10  frankly, just like Decas didn't have standing to

11  challenge your client's subpoenas, I'm not sure that you

12  have standing to appear in front of the Massachusetts

13  court on behalf of your clients here in Wisconsin to ask

14  for relief or even an advisory opinion.  I think one of

15  the parties would have to do that.  So that would be

16  what this Court anticipates.

17          MR. CURTNER:  I agree that I don't have

18  standing in Massachusetts.  We thought about that, Your

19  Honor, and I suspect that that's why Ocean Spray is not

20  serving Swendrowski is it keeps him from showing up to

21  make the arguments you're suggesting should be made.

22          THE COURT:  Well, I'm not suggesting what

23  should or should not be done, I'm just looking for the

24  parties' opinion about what would be most efficacious

25  here, and as I indicated, oftentimes getting input from

1    the presiding judge as to what that judge thinks is

2    appropriate is helpful to the Rule 45 judge.  But with

3    that, Mr. Curtner, why don't you give me a couple of

4    sentences on wrap up, I'll hear a reply from

5    Mr. Pfeiffer, and then I'll tell you what we're going to

6    do today.

7         MR. CURTNER:  I think I'm basically through,

8    Your Honor.  I really think the most pertinent point is

9    the one I made, that a lot of this could have been

10   avoided by counsel complying with Rule 45(c)(1) and

11   narrowing the scope of things.  But they declined to do

12   that.

13        Secondly, that that same obligation on the parties

14   seeking discovery clearly mitigates in favor of not

15   trying to burden these third parties unless and until

16   Swendrowski got a chance to be heard and do whatever

17   he's going to do in Massachusetts.  And the report goes

18   back to the Massachusetts judge on January 27th as to

19   how Ocean Spray believes it has somehow been harmed by

20   any of this talk about a lawsuit.

21        THE COURT:  All right.  Well thanks for your

22   input.  Mr. Pfeiffer, why don't you give me a brief

23   reply and then we'll give you a ruling for today.

24        MR. PFEIFFER:  Certainly, Your Honor.  Let me

25   start with this issue about Mr. Swendrowski and service

1    of him, because there's been a suggestion that we, Ocean

2    Spray, are trying to game this somehow to exclude him

3    from the process.  Let me assure you quite the opposite.

4    Mr. Swendrowski is represented by counsel; not counsel

5    who is on the phone here today, none of us represent

6    him.  He's represented by his own counsel.  And that

7    counsel asked us not to serve him and said that he wants

8    to meet with us and prefers that we meet with him rather

9    than serve him.  We've been trying to schedule that with

10   everybody's busy schedules, that's why we haven't served

11   him, at his request.

12        THE COURT:  And I accept that, Mr. Pfeiffer.

13   I'm not going to pick sides on that one.  Really my job

14   is more pragmatic, because once we resolve this, I'm out

15   of your lawsuit for the most part.  I guess the question

16   is still, and I'll let you respond in whatever other

17   fashion you think is appropriate, but do you have any

18   additional concerns or observations you'd like to offer

19   in response to the Court's plan simply to stay this

20   until you get Swendrowski on board and perhaps get a

21   chance to get some input from the Massachusetts judge?

22        MR. PFEIFFER:  I think input from the

23   Massachusetts judge is a good idea, Your Honor, and I

24   think that that would put to rest the notion that she

25   has what was called grave doubts about our case.  That's

1  not at all what she indicated at the scheduling

2  conference.  We were there, Your Honor.

3      THE COURT:  Sure.  And she's the one who told

4  you to go out and find your John Does, so I think I can

5  predict what she might say, but I presume you don't have

6  any problem with asking her if she's got any input on

7  the efficacy of your Rule 45 subpoenas from Wisconsin.

8      MR. PFEIFFER:  No, we don't, Your Honor.  The

9  only concern I would have is I would hesitate to

10 condition that on Mr. Swendrowski's doing anything in

11 light of the fact that he has sought us out and

12 apparently wants to talk about some resolution that

13 involves him not being ultimately served and a party in

14 a lawsuit.

15     THE COURT:  Well, I'm not going to tell you how

16 to litigate your case, but as long as -- from this

17 Court's perspective, so long as Mr. Swendrowski's lawyer

18 is advised of this Court's plan and is given the

19 opportunity to opt-in and be heard on this and perhaps

20 participate in the deposition or not, it is up to him

21 then whether he chooses to go forward or not and based

22 on what he does, does not do or fails to respond, I'll

23 leave it to you to decide what your calendar is.

24     MR. PFEIFFER:  That's great, Your Honor, with

25 that clarification, which I very much appreciate.  From

1  our perspective, getting -- if getting guidance from the

2  Massachusetts court will help this Court with its Rule

3  45 decision, we'd like to do that as expeditiously as

4  possible.

5           THE COURT:  Well, I'll leave it to you to do

6  that in the manner that is most efficient and most

7  desirable to that court.  And let me make it clear to

8  both sides I'm capable of giving you a ruling and at

9  least at this point my position is that I would not

10  quash the subpoena.  I might require the parties to meet

11  and confer and see if they can narrow it, but I also

12  don't want you wasting your time arguing with each other

13  point-by-point.  I think I can predict that this is

14  going to be a fairly contentious, hard fought deposition

15  for each of these three men and there may be myriad

16  assertions of privilege, and if Mr. Curtner is right, it

17  will be 100%, in which case we may all be on the phone

18  again.  But I don't go looking for trouble, I wait for

19  trouble to come and find me.

20       And so with that, I think if we stay proceedings

21  indefinitely waiting for, I suppose, the movant, for

22  Ocean Spray to get back to the Court and ask for further

23  action, we're done for today.

24       Mr. Pfeiffer, it was your motion originally.  Can

25  you live with that?

1     MR. PFEIFFER:  Yes, Your Honor, only -- the
2     only thing I question is if, for example,
3     Mr. Swendrowski is not the trigger for the reasons that
4     we've suggested, if the Massachusetts court says I don't
5     understand this procedurally, this doesn't seem like
6     there's a dispute, I guess we'd need to come back to you
7     and perhaps ask for some assistance in getting the court
8     to give us that.
9          THE COURT:  I'm sorry, I'm not tracking.
10         MR. PFEIFFER:  In other words, if the court
11    came to us and said wait, you're coming to ask me about
12    a Rule 45 dispute that I don't have a role in, how can I
13    give you any information that --
14         THE COURT:  Oh, sure.  I could give you a
15    ruling today.  But the main reason I'm staying is I want
16    to give Swendrowski, Mr. Swendrowski, a chance to be
17    heard.  We already talked about that.  I'm not going to
18    repeat myself.  He can choose to be heard or not on
19    that.
20        As long as we're waiting for that, my secondary
21    suggestion is that you seek input from the judge in
22    Massachusetts as to whether this is what she had in mind
23    in terms of getting John Does.  If she gives you this
24    question like what are you asking me, that's fine.  If
25    she doesn't have anything to offer, I'm not going to ask

1  you.

2         MR. PFEIFFER:  I'm not going to blame it on

3  you, Your Honor.  For sure.

4         THE COURT:  I can give you a ruling today if

5  necessary, but I always like to give the presiding judge

6  the opportunity to be heard, if it would be helpful to

7  the parties in framing the dispute or the resolution by

8  the Rule 45 judge.

9         MR. PFEIFFER:  Understood, Your Honor.  We will

10  bring it to the Massachusetts court's attention and see

11  what we can accomplish.

12         THE COURT:  All right.  Well then the ruling

13  today is that I will stay this pending further input

14  from any party withstanding.  Mr. Curtner, anything else

15  today then?

16         MR. CURTNER:  No, Your Honor, other than if the

17  issue relating to these subpoenas is going to be

18  discussed with the judge in Boston, we would request to

19  be invited.  Obviously whether we are allowed to be

20  heard or not would be up to that judge, but we would

21  request to have notice of any such conversation.

22         THE COURT:  I think you're entitled to the

23  notice.  I don't know that you're entitled to be heard,

24  but I'll leave that to the district judge in

25  Massachusetts to sort out.

1        MR. PFEIFFER:  We will certainly make sure you

2    have notice.

3        THE COURT:  Okay.  Well, I think that's all we

4    can accomplish today.  This has been helpful and I'm

5    sure we'll be back on the phone soon to give you a final

6    ruling, but let's wait for some other actions to occur

7    before then.  With that, thank you all, and please enjoy

8    the rest of your day.

9        VOICE:  I'm sorry, Judge Crocker --

10       (End of hearing at 1:56 p.m.)

11

12       I, LYNETTE SWENSON, Certified Realtime and Merit

13   Reporter in and for the State of Wisconsin, certify that

14   the foregoing is a true and accurate transcription of

15   the audio recording held on the 5th day of January 2011

16   before Stephen L. Crocker, Magistrate Judge for the

17   Western District of Wisconsin.

18   Dated this 9th day of January 2011.

19

20                   /s/_____

21                   Lynette Swenson, CRR, RMR, CBC
                     Federal Court Reporter

22

23

24   The foregoing certification of this transcript does not
     apply to any reproduction of the same by any means
25   unless under the direct control and/or direction of the
     certifying reporter.